FILED BY _____ D.C.

JUL 1 4 2017

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. FT. LAUD.

# IN THE UNITED STATES SOUTHERN DISTRICT
# COURT OF FLORIDA

| | |
|---|---|
| NADINE MCINDOO | **COMPLAINT FOR LEGAL MALPRACTICE** |
| **Plaintiff** | |
| vs. | Case No. `17cv61405-CMA` |
| LEGALSHIELD/GLANTZ & GLANTZ, FL<br>KARL SCHOLES ESQUIRE, AZ | **PLAINTIFF DEMANDS A TRIAL BY JURY** |
| **Defendants** | |

Plaintiff Nadine McIndoo respectfully allege as follows:

## NATURE OF THE CASE

This is a civil action for personal injuries suffered by Plaintiff Nadine McIndoo, against Karl Scholes, ESQ and LegalShield / Glantz & Glantz P.A.

## PARTIES

Nadine McIndoo - (hereinafter "Plaintiff")

Mr. Scholes, KARL SCHOLES, (hereinafter "Mr. Scholes") is an individual and an attorney licensed to practice law in Arizona with an office in Tempe, Arizona.

LEGALSHIELD, is a corporation and services are provided through Glantz & Glantz P.A.

1

**VENUE**

Venue is proper under 28 U.S.C. § 1391(b) as Glantz & Glantz, is located in Plantation Florida, in the County of Broward, which falls within the jurisdiction of this Court. in this District.

There is diversity of jurisdiction as at least one of the Mr. Scholes is in Maricopa County in Tempe, Arizona and not a citizen of the State of Florida.

**FACTUAL BACKGROUND AND ALLEGATIONS**

1. LegalShield develops and markets pre-paid legal service plans through a network of more than 6,900 independent provider attorneys across the U.S. and Canada.

2. LegalShield offer to provide you with the best and most competent attorneys for just about any kind of legal matter one might have and for anywhere in the country.

3. I was introduced to Legal Shield by a neighbor after he inquired about not seeing the Plaintiff's son around.  The PLaintiff told him that the child was in Arizona and that she was going  through a custody battle in court in Arizona. Right away he started telling me about LegalShield and I joined in hopes of finding a really good attorney and saving money while doing so. The Plaintiff  joined LegalShield, a corporation in September 2013.

4. Based upon said pending case in Phoenix, Arizona the Plaintiff contacted LegalShield at Glantz & Glantz, P.A. office. I was referred to an attorney in

Arizona by Legal Shield. The Plaintiff was told that the refer are reputable and competent.

5.  I was contacted by a Mr. Karl Scholes, ESQ from Arizona the following day. I discuss the case with him and he stated that he was available for the hearing on October 8, 2013 if I chose to retain him.

6.  I asked Mr Scholes for a price and he stated that he could not give me one right away. I told him I spoke to several other attorneys who gave me a price upfront. Mr Scholes stated that he could not give me a price but remember that I would be getting discounts as a LegalShield member. My lowest quoted price was $4000. 00 for a custody trial from Alexia Peterson from the Baker Law Firm. I had also previously met with her in May 2013 while I was in Arizona and read her reviews which were great.

7.  The Plaintiff retained Karl Scholes from Davis, Miles, McGuire Gardner for legal representation in a Resolution Management Conference regarding a Petition to Establish Child Custody and Petition to Modify Parenting Schedule in Arizona.

8.  The Plaintiff paid the retainer on October 8, 2013 and hired Mr. Scholes as my attorney to represent me in the matter.

9.  Mr. Scholes first represented me on October 8, 2013 in Court and the Plaintiff appeared via telephone for that hearing. A Court Appointed Advisor (CAA) was appointed. New dates were set for November 18, 2013

10. The Plaintiff thereafter sent emails on a regular basis and updated Mr. Scholes as much as possible on everything that took place and was continuing to take place with the case, the child and the Child Father's doing. The Plaintiff was also

always available if Mr. Acholes needed to speak with her by telephone or by
email.

11. Shortly after sending all documents in October  Mr. Scholes advised the Plaintiff
that he wanted to see the child interview that was ordered by Arizona Judge
Janice Crawford. Mr. Scholes told the Plaintiff that he was made aware that the
report was with the Judge and that he was going to contact the Judge. And my
heart sank because Judge Janice Crawford was against me. Arizona Court was
so much against me that they had the Florida Judge Laura Watson dismiss my
petition on this case in Florida on August 09, 2013.

12. After that on October 25 and October 28, 2013 Mr. Scholes gave me legal advice
"be careful about making your focus this case about Ashley. His shortcomings are only
part of the case".

13. How can I not make it the focus about the Father's shortcomings if I wanted to
get my child back? How can I not talk about the fact that I know the Father was
going to wreck and ruin the child's life if I wanted my child back? How can I not
talk about the fact that the Father traffics marijuana if I wanted my child back
and I do not want my child to be exposed to that kind of life? I did not want my
child to be exposed to any kind of criminal life and I knew it would have if the
custody was in the Father's custody. How can I not talk about the fact that the
Father refused to pay child support and having the child in his custody was his
main motive of filing for custody of the child when I got sick?I know that because
I had many text messages from the Father that he wanted me to take him off
Child support. How can I not talk about the fact that I know that the Father is a
compulsive liar and manipulator. How can I not make the focus about the
Father's shortcomings when I know him more that all of the people he is lying
and fooling? The Arizona Judges did not want me to talk about the Father's

4

shortcomings because they were believing the lies to the point where even the Arizona Court Judges started lying on me. And I know Mr. Scholes was talking to these Judges

14. The Plaintiff watched as her son started getting nothing but Fs in school in Arizona while he was a honor roll student in Florida.  Today my son is in jail and going to be a prisoner sentenced to 4 years in prison because of the lies that were told to him by his father while he was in the Father's custody.

15. Mr. Scholes stated that I should not talk about my son's Father shortcomings. At the time of the search warrant in Arizona on February 18, 2016  for the Plaintiff's son the Detective stated in writing that t"hree adult "Jamaican" men were living at the Father's home with the minor child at the time that the warrant was served. As a result of the warrant, the police found packaging materials for marijuana in the Father's possession and the Father is currently under investigation".

16. And these are the things that I wanted the attorney to speak about that I know that the Father traffick marijuana and he is a drug dealer but Mr Scholes advised me not to at least 2 times in writing not to talk about the Father's shortcoming and that I should talk about what is in the best interest for the Child. SO I guess it is in a minor child's best interest to live with grown men who are only going to teach the child what they know which is to be "gangster" and a "dealer".

17. On July 15, 2015 the Plaintiff was able to get the case back in the State of Florida. The case went before Judge Nicholas Lopane. After Florida Judge Nicholas Lopane made his order that the Child should be returned to the Plaintiff in Florida on January 21, 2016 the Father went and berated the child angrily and told him that he was ungrateful for wanting to go back to her. The Father was angry that the Plaintiff's son gave testimony to the Guardian aD Litem (GAL)

named Natasha Mayne that he wanted to come back to his mother in Florida. The Father was also angry the the Plaintiff's son was calling his baby sister in Florida and telling her that he wanted to come back to the Plaintiff in Florida.The Father also told the child that the Plaintiff did not live anywhere and that the Plaintiff house was in foreclosure. The Plaintiff's son told her that Christina, the Father's girlfriend, also called him and told him the same thing that the Plaintiff house was in foreclosure and tried to discourage him from wanting to go back to her. The Plaintiff's son heard 3 other children planning a robbery to rob a drug dealer and he joined them to try to get money for her.

18. At the time that the Father told the child that the Plaintiff's home was in foreclosure the Plaintiff had already lost her home 4 months earlier in October 2015 and the Father was aware of that. The Father was also aware that the Plaintiff was renting an apartment because he tried numerous times to tell the GAL (Natasha Mayne) and Judge Lopane that the Plaintiff did not live anywhere but the GAL did do a home visit to the apartment.

19. On November 15, 2013 Mr. Scholes called and sounded rushed and wanted to drop what I was doing and to review the pretrial statement. I was nowhere near my computer and had use my cellphone. From what I started reading the whole thing was wrong that he wrote. He sounded frantic like someone who was running out of time because he could not believe the things that he had to correct.

20. On November 18, 2013 I heard the Arizona Judge state to my attorney Mr.. Scholes that my pretrial statement was only submitted on Friday and he did not have time on Monday November 18, 2013 to look at the issues - transcript of 11302013 hearing page 17

6

**THE COURT:** Sir, you didn't file a pretrial statement. Your pretrial statement, counsel, candidly was filed Friday. That's not five days in advance and me having to come -- I -- even looking at it this morning it still doesn't address these issues.

21. The Plaintiff could have filed an on time pretrial statement on my own. And the pretrial statement was still not accurate at the time that it was filed.Mr. Scholes was charging me 3 times the highest quote that I received for the case and could not file my pretrial statement on time.

22. The CAA's additional (second) report was dated December 13, 2013 and it was never sent to me by Mr. Schole

23. On December 13, 2013 I received an email from Mr. Scholes stating that he had received my son's father pretrial statement and he wanted to know my thoughts. Mr. Scholes also stated that he wanted to meet with me 15 minutes before the hearing.

24. Right before the Plaintiff left for the airport on December 15, 2013  I sent Mr.. Scholes a detailed email regarding the fact that my son father was committing perjury and that I wanted Mr. Scholes to speak about perjury in Court - EXHIBIT

25. On December 16, 2013 the Plaintiff met with Mr. Scholes for the 15 minutes and the Plaintiff asked him if he received her email and he said yes. So the Plaintiff told him it was important to talk about perjury because the Father 's pretrial statement was filled with lies and his witnesses were lying. Mr.. Scholes said "it is family court Nadine everybody lies". SO now because everybody lies I lost custody of my son to the father and my son is now incarcerated in jail and is going to prison for four (4) years in Arizona and four (4) years probation after

7

that. This has been the traumatic, excruciatingly painful result for both mother and child.

26. Before we went into the courtroom Mr. Scholes stopped me at the door and told me that once I went in the court not to talk out of turn or talk as he did not want to get the Judge upset. M.r Scholes said remember how he yelled at the Father and I said yes and he said okay just let me take the lead. And I said okay.

27. The Court Appointed Advisor issued her additional report and up to minutes before the Judge came in the Plaintiff had not seen the report and I kept asking Mr. Scholes where is the report? When am I going to see the report?

28. Finally after the Plaintiff keep asking Mr. Scholes for a report Mr. Scholes asked a man who was standing next to the Judge's chair for a copy of the report.  I noticed the man when through a door on the right of where he was standing and came back with a paper which was the report and he handed the report to Mr. Scholes and Mr. Scholes gave it to me. This was about 5 minutes before the Judge came in and called the Court into session. The Judge came in from the same door that the man went through to get the report.

29.  I never got to read the report in it's entirety before the Court hearing.

30. Mr Scholes did NOTHING for me at this hearing. Mr Scholes was only there in body. A careful review of the transcript of December 16, 2013 can show that he was lost at times and did not even know what the opposing party was talking about.

31. Mr. Scholes never objected to me getting the report at such last minute. And I was told by other attorneys that he should have objected to that.

32. I expected Mr. Scholes to have taken the lead and go over the additional report and question the CAA, the Father and all the witnesses that he had. That was not done.

33. After the Judge called the court to start and the CAA came on the phone Mr. Scholes took the report from me and quickly turned it to the page which had the CAA's recommendation. I noticed that he knew exactly where the CAA's recommendation started and he started to underline it for me with his blue pen

34. After the CAA came off the phone and the Father was going on and giving his statements and there were moments that I felt that Mr. Scholes could have objected but he did not. At one point I looked at him and his head was bent down reading something in front of him. I leaned in next to him to see what he was reading and he was reading my mortgage foreclosure complaint that the Father had printed off of the Florida Court website. Instead of reading my mortgage foreclosure documents Mr. Scholes should have been listening to the Father and trying to make objections where possible and cross examine the Father.

35. I review of December 16, 2013 transcripts shows that Mr. Scholes was thrown off guard many times by the Father and my the allegations that he was making.

36. After court was over M Scholes tried to take the report from me and I told him no that I did not get a chance to read it and that I needed to read it

37. At the November 18, 2013 Mr. Scholes asked me if I had gotten a chance to look over the report.

Q Okay. So now we also heard the Court-appointed advisor testify briefly today,

right, Nadine?

A Yes. 16

Q Did you have a chance to look over her report?

A Yes, I did.

38. So why was I not given a chance to look over the additional report? Why was the report given to me minutes before the hearing? And why did Mr. Scholes not object to me getting the report before that? The FAther received received the CAA's report before December 16, 2013.

39. The Arizona Court of Appeal wrote: Mother also presents numerous arguments in her briefs attacking the credibility of Father, the court-appointed advisor, the superior court, and various other individuals. However, she does not contend the arguments she now makes, nor the evidence she asserts supports them, were unavailable to her at the time of trial. Because she did not introduce the purported evidence or testimony, or make the arguments in her closing during trial, they are waived.

40. So because the Plaintiff never received the CAA's report before the trial and saw all the lies the Plaintiff raised the matter in her appeal briefings and was told that she did not introduce the purported evidence or testimony, or make the arguments in her closing during trial, they are waived. Again the Appeal Court made no mention of my paid legal representative and many times all the blame was laid on the Plaintiff. And I had an attorney who should have handled this.

41. I was also told that Mr. Scholes still had time after the Order was delivered on December 17, 2013 to object to me not getting the report right before the hearing

42. One key element was for him to instructed the Court Appointed Advisor to get a report from the Doctor and/or subpoena the Doctor which Mr. Scholes never did.

43. Mr. Scholes never even say to me to get the diagnosis from the Doctor instead the Father stated that I had paranoid schizophrenia and Mr.. Scholes asked me if that was true and I said no.

44. Mr. Scholes never pointed out the fact that no home study was done on the Father and the CAA had not even gone to see where the child was living.

45. The Father's testimony to the CAA was not cross examined by Mr. Scholes

46. None of the Father's four (4) witnesses who spoke against me were cross examined by Mr. Scholes.

47. One key witness of the Father was Sharon Trepiccione. Sharon Trepiccione spoke directly to the Court Appointed Advisor (CAA) who was appointed by the Judge in Arizona. Sharon Trepiccione's testimony was submitted in a written report to the Arizona Court.

48. Sharon Trepiccione was never cross examined by Mr.. Scholes.

49. If Mr. Scholes had conducted appropriate discovery and cross examination questions on the issue then perhaps the Court would have discovered admissible evidence sufficient to show that the Father's witnesses were not credible. I know that if Mr. Scholes had cross examined Sharon Trepiccione they would have known that she was lying and committing perjury. The lies and discrepancies were obvious and were not hard to uncover. Mr. Scholes did not even ask Sharon

Trepiccione when was the last time she saw the Plaintiff and under what circumstances. The last time that the Plaintiff saw Sharon Trepiccione was on November 21,2013 at a fundraiser. On November 21, 2013 Sharon Trepiccione gave damaging testimony against the Plaintiff that was nothing but lies and made a recommendation that her son should live with his Father to the CAA.

50. The Arizona Court also made several references to Sharon Trepiccione and the Father in the order to give custody to the Father on December 17, 2013 so therefore the Court relied on Sharon Trepiccione's testimony and on the Father's testimony which were lies.

51. The questioning of Sharon Trepiccione and the other three (3) witnesses during the trial, hearing, or deposition by Mr. .Scholes was extremely important and necessary in order to evaluate the truth of the Father's witnesses testimonies, to develop the testimonies further, and/or to accomplish any other objective.

52. I filed an appeal with the Arizona Court of Appeals and the Appeal Court stated that it was my responsibility to have subpoena the Doctor to testify on my behalf which would inadvertently been Mr.. Scholes responsibility.  Arizona Court of Appeals stated on page 12 that:

Contrary to Mother's assertion, it is the party, not the superior court judge, who is responsible for calling and questioning witnesses. See State v. Coey, 82 Ariz. 133, 138, 309 P.2d 260, 263 (1957) ("It is primarily the responsibility of the parties and not the court to insure that witnesses are present at the time of trial."). Mother rested on her own testimony, and her failure to secure the presence of doctors or therapists to support her position does not constitute error.

53. A careful review also of the Arizona Court of Appeals decision shows that it does not make any reference at all as to the fact that I was represented by legal counsel and I was blamed by the Appeal Judge for all deficiencies they claimed during the trial that would have been Mr.. Scholes responsibility.

54. After the hearing on December 16, 2013 the Plaintiff called Mr. Scholes and I told him how upset I was and that they were wrong and Mr. Scholes said to me that he did not know what to do or say because  the only people who are saying that you are  okay and not severally mentally ill is you and your son.

55. Mr. Scholes never spoke to my Doctor or Therapist or subpoenaed him

56. The CAA never spoke with my Doctor or Therapist . The CAA stated that:

Q Did you ever find out if Mother had ever been diagnosed with any sort of mental health diagnoses?
A No,

57. The CAA stated that the letter she received from the Doctor was sufficient

My concern would have been if I did not receive the letter from the psychiatrist then there was cause for a concern. However, the letter states that mother is taking her medication and she's in compliance with the psychiatrist. That  would have been my concern.
Q Okay. So did that letter sufficiently satisfy any worries you would have with the Court ordering that this child be returned to mother?
A It would satisfy. It was fine.

58. After that testimony on November 18, 2013 the Plaintiff Father went and saw the CAA at the courthouse on November 21, 2013 and told nothing but lies and got 4

13

other witnesses to lie on his behalf. The Father's testimony and the 4 witnesses testimonies were never cross examined by Mr. Scholes

59. On November 18, 2013 court hearing the Judge stated that he would give the Father an opportunity for cross examination so then why would my attorney not ask for an opportunity to cross examine the opposing party and his witnesses?

THE COURT: We'll stand in recess. We'll be back here on December 16th at 10:30 in the morning. I'm giving -- I'm allotting one hour for the conclusion of the case. Basically it's going to be any final cross-examination that you have, sir. I'm going to give you an opportunity to testify and I'm going to listen to the Court-appointed advisor and consider the additional report.

60. Nobody including Mr. Scholes spoke to my Doctor or Therapist but the Plaintiff was ordered to do a psychological evaluation as recommended by the Father because he and Sharon Trepiccione stated that the Plaintiff was severely mentally ill. How are people without medical degree making diagnosis and my paid attorney never sought to get this reputed and get the Doctor and Therapist on the record to state what is the Plaintiff's mental health diagnosis and treatment plan, if any.

61. The Plaintiff told Mr. Scholes that she did not agree with the CAA's report and Mr. Scholes stated that he tried calling her several times and did not get her and that the Plaintiff needed to try to call her. The Plaintiff called the CAA and the CAA stated that she should be talking to my attorney not me and she said she would call him. Mr. Scholes stated he never talked to her but I was billed for him talking to her after the last hearing I was also billed for Mr. Scholes talking to Sharon Trepiccione and Mr. Scholes has never stated to me that he spoke to her and what the call was about.

62. Mr. Scholes never even say to me that the Arizona Court was wrong to write that: "THE COURT FINDS that the parties and the Child have resided in Arizona continuously for at least the six months preceding the filing of the Petition to Establish Legal Decision Making (Child Custody) and Parenting Time, filed on January 8, 2013 (the "Petition"). This Court, therefore, has jurisdiction as Arizona is the "home state" of the Child. See A.R.S. § 25-1031.

The Plaintiff and her son never resided in Arizona and Mr. Scholes was aware of this as it was given in the Plaintiff's testimony at the November 18, 2013 hearing.

Mr. Scholes was my attorney so how did he not see this major misrepresentation of the facts by the Arizona Court and assist me to go back before the Judge

63. On Page 3 the Order states "Further, this Court has jurisdiction pursuant to A.R.S. § 25-402 and continuing jurisdiction pursuant to A.R.S. § 25-1032. THE COURT FINDS that the federal Parental Kidnapping Prevention Act does not apply and that no international law concerning the wrongful abduction or removal of children applies".

64. The Plaintiff was told by two (2) other attorneys who reviewed the documents that Mr. Scholes could have gotten up at the very last second at the last day of the trial on December 16, 2013 and let the Arizona Court know that they did not have jurisdiction to hear the case and asked for the case to be dismissed on the grounds of lack of jurisdiction. Mr. Scholes never did this as he was more interested in the Plaintiff not upsetting the Judge.

**FIRST CAUSE OF ACTION**

Legal Malpractice against Mr. Scholes

15

65. Mr. Scholes had a legal responsibility to properly prepare for trial and did not. Based on the CAA's additional report Mr. Scholes should have had a series of questions ready to cross examine the other party's witnesses

66. Mr. Scholes had a legal responsibility to properly prepare me for trial and he did not do such.

67. Mr. Scholes had a duty to use such skill, prudence, and diligence as members of the legal profession commonly possess and exercise, in providing legal services to Plaintiff.

68. As stated above, during the course of Mr. Scholes's representation there were several instances wherein the conduct of the Mr. Scholes fell below the applicable standard of care.

69. The conduct of Mr. Scholes in doing the acts and omissions herein alleged directly resulted in damages and harm to the Plaintiff and her son.

70. The Plaintiff have suffered extreme emotional and physical distress, including but not limited to fright, nervousness, sleeplessness, anxiety, worry, mortification, shock, humiliation, and indignity, to an extent and in an amount subject to proof at trial. Nobody, including Plaintiff and her son, could reasonably be expected to endure the types of affront inflicted upon Plaintiff without sustaining the type of damages herein alleged.

71. Mr. Scholes did send me an email wishing me peace but how can I have peace when he did properly do his job. The Plaintiff lost custody of her son and now her

son is going to prison for 4 years because Mr. Scholes decided to take the advice of Judges and sat and did nothing instead of properly representing the Plaintiff.

## SECOND CAUSE OF ACTION

Breach of Fiduciary Duty against Mr. Scholes

72. Mr. Scholes owed the Plaintiff a fiduciary duty to act at all times in good faith and in the Plaintiff's best interests, and had a duty, among other things, to perform the services for which they were retained with reasonable care and skill, to act in Plaintiff's highest and best interests at all times, and to not expose Plaintiff to any unnecessary risk or peril. This fiduciary and confidential relationship was never repudiated by the Mr. Scholes at any time herein mentioned.

73. Mr. Scholes breached the fiduciary duties and obligations to Plaintiff by doing all of the acts and omissions as herein alleged. Among other things, Mr. Scholes breached their duty by failing to properly counsel and advise the Plaintiff and placing his interest in charging unconscionable fees above normal amount, and by generally mishandling and overbilling in this case to such an extent that the Plaintiff was forced to incur excessive and unconscionable legal fees.

74. Furthermore, in doing all of the above described acts and omissions constituting Mr. Scholes's breach of his fiduciary duties owed to the Plaintiff, the Plaintiff sustained damages, including but not limited to, legal fees incurred to the Mr. Scholes, continued legal fees after the trial, loss of custody of the child and additional economic and out of pocket losses and damages to be presented at trial, all according to proof.

75. The acts and omissions constituting breach of the Mr. Scholes's fiduciary duties were committed with oppression, fraud and influenced by the Arizona Family Court Judges.

### THIRD CAUSE OF ACTION

Breach of Fiduciary Duty against Mr. Scholes

76. LegalShield promised they would get you the best reputable and competent attorney and was not the case.

77. Mr. Scholes met with me for 15 minutes at the courthouse on December 16, 2013

78. It was evident to me that Mr Scholes had seen the CAA's report dated December 13, 2013 before the hearing on the 16th. And if he did not and he is my attorney why would he accept that? Wouldn't Mr Scholes need time as counsel to go over the report and discuss it in details with me? A competent attorney who is truly working for me would have done that. I could have done that myself and I am not a lawyer.

79. I trusted that Mr Scholes would assist me and he did not do so as an attorney.

80. The Plaintiff reported Mr Scholes to the Arizona Bar as instructed by LegalShield and Mr Scholes started to lie on the Plaintiff to the Arizona Bar and stated among other things that I was not available at times when he needed to talk to me. That was a lie. I have phone records and emails to refute that.

81. I went to LegalShield conferences and they stated that they offered nothing but the most reputable and best attorneys and that the fees would be more affordable that going on your own to find an attorney. My legal bill from Mr. Scholes was almost 3 times the lowest quote that I received.

18

82. I would never have retained Mr. Scholes if it was not for LegalShield and I trusted LegalShield that he was competent as the service stated they do all the work to get the best lawyers and they only have the best lawyers in their network..

## DEMAND FOR A JURY TRIAL

Plaintiff hereby demand a jury trial as to all issues so triable as a matter of right, pursuant to F.R.C.P. 38(a), 38(b)(1) and 38(c).

## PRAYER FOR RELIEF WHEREFORE,

Plaintiff demand upon the Defendants:

A. actual, compensatory and statutory damages

B. punitive damages as allowed by law

C. pre and post-judgment interest as allowed by law

D. an award of attorney fees, as allowed by law

E. an award of taxable costs; and

F. any and all such further relief as this Court deems just and proper

Respectfully Submitted

NADINE MCINDOO, Plaintiff
ProSe
5409 NW 27TH Street,
Lauderhill, FL 33313
(954) 551-1678

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy hereof has been furnished by U.S, mail this day of July 14, 2017 to LegalShield Glantz and Glantz, P.A. 7951 SW 6th St, Plantation, FL 33324

I HEREBY CERTIFY that a copy hereof has been furnished by U.S. Mail this day of July 14, 2017 to Karl Scholes, partner at Miles, Davies, McGuire Gardner , 80 East Rio Salado Parkway, Suite 401 Tempe, Arizona 85281  Telephone 480.733.6800

**From:** N & N Taxes - Nadine McIndoo <mcindoon@aol.com>
**To:** mcindoon@aol.com>; kscholes <kscholes@davismiles.com>
**Cc:** mjones <mjones@davismiles.com>
**Subject:** 82 pages from Ashley - McIndoo, Nadine (26684-001)
**Date:** Sun, Dec 15, 2013 6:13 pm

Hello Karl,

I need you to understand and do the following:

1. In court I need you to stress what **PERJURY** is...and the consequences of it

**1. Based on the Law**: The deliberate, willful giving of false, misleading, or incomplete testimony under oath

2. **IF** Sharon Treppicione comes on by telephone as a witness for Ashley, I need you to ask the following questions:

 1. Is she Nadine's friend or Ashley's friend?

 2. Did Nadine ask you to help with Nicholas if she should get sick or go to the hospital as according to the letter that was given to her

 3. Did she go to the shelter hearing with Ashley on December 21, 2013 as was written by Ashley (I will find the page)

 4. Nadine called you at least 3 times when she could not get in touch with Ashley and asked you what happened and you told Nadine that you did not know anything and that Nadine needed to speak with Ashley. Why did you not inform Nadine that you went to the court hearing also and informed Nadine of what happened at the court hearing as asked by Nadine at least 3 times? That was the purpose of Nadine leaving YOU in charge, to act on her behalf and inform you accordingly.

3. This was a modern day set-up to kidnap Nicholas by Ashley and he was helped by Sharon

4. As in Simon Whitley's statement Ashley tried to kidnap Nicholas also in December 2010; I went to Lauderhill Police Dept and they called Nassau County Police who called them and that was when they put Nicholas on a plane back to Florida

5. I never left Nicholas with Ashley when Nicholas was 4 months. When Nicholas was 4 months was when the custody and visitation court was taking place in Westbury, New York. Nicholas was with me and I even took him to court with me sometimes. Court was completed in November as evidenced in the final custody papers and if I had left Nicholas with him and disappeared then WHY did the Court award me custody before Nicholas turned 1 year old.

Like I said there were 82 pages of **LIES** and I need the WORD "**PERJURY**" TO BE STRESSED AND EXPLAINED IN COURT

I will discuss this more in the morning

Thank you,
Nadine


-----Original Message-----
From: N & N Taxes - Nadine McIndoo <mcindoon@aol.com>
To: kscholes <kscholes@davismiles.com>
Cc: mjones <mjones@davismiles.com>
Sent: Fri, Dec 13, 2013 1:49 pm
Subject: Re: McIndoo, Nadine (26684-001)

Majority of these things are not true or are a complete twist on what has happened and I can prove that or explain these things to the Judge.

I will be coming on Sunday. Yes I can meet you at the court on Monday at 9:45am.

-----Original Message-----
From: Karl Scholes <kscholes@davismiles.com>
To: N & N Taxes - Nadine McIndoo (mcindoon@aol.com) <mcindoon@aol.com>
Cc: Marlo Jones <mjones@davismiles.com>
Sent: Fri, Dec 13, 2013 11:34 am
Subject: FW: McIndoo, Nadine (26684-001)

Nadine,

I got this from Ashley. He is obviously back pedaling and trying to get a lot of information to the Court that he has not provided me until yesterday. I don't think that the court will allow him to use these exhibits, but I don't know what the judge will do for sure. Look this over and let me know your thoughts.

Also, when are you getting into Arizona? Do you just want to meet at the Court again on Monday at about 9:45?

Let me know.


Karl Scholes, Attorney

Law Offices of
Davis Miles McGuire Gardner, PLLC
80 E. Rio Salado Parkway, Suite 401
Tempe, AZ 85281

Tel: (480) 733-6800
Fax: (480) 733-3748

# Davis Miles
# McGuire Gardner
http://www.davismiles.com

From: Lee Gaxiola
Sent: Thursday, December 12, 2013 1:39 PM
To: Karl Scholes
Cc: Marlo Jones
Subject: McIndoo, Nadine (26684-001)

*(cc) Petitioner's Separate Pretrial Statement*

Today's mail processed

Thanks

Lee Gaxiola, Efile/Docket Dept.

Law Offices of
Davis Miles McGuire Gardner, PLLC
80 E. Rio Salado Parkway, Suite 401
Tempe, AZ 85281

Tel: (480) 733-6800
Fax: (480) 733-3748